**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **COLOSSAL BIOSCIENCES INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No.: 26-3112 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| **JAMES KEHLER,** | § | |
| | § | |
| Defendant. | § | |

# COMPLAINT

Plaintiff Colossal Biosciences Inc. ("Colossal") files this Original Complaint against Defendant James Kehler ("Kehler") and alleges as follows:

## INTRODUCTION

1. This is an action for trade secret misappropriation and breach of three separate contracts arising from a former senior executive's dishonesty, greed, and betrayal of the confidential science at the heart of Colossal's mission.

2. Colossal is the world's first de-extinction company. Its scientists are working to restore lost species, including the woolly mammoth, the dodo, the thylacine, and the dire wolf, and to apply the same breakthrough technologies to protect endangered species living today. That work depends on Colossal's proprietary and next-generation genome-editing, cell-engineering, stem-cell, embryology, and animal-science methods, protocols, and data – all developed over years of painstaking trial and error at enormous expense.

3. Kehler served as Colossal's Vice President of Animal Sciences and, later, its Vice President of BioSynergy. In those roles, Kehler was entrusted with Colossal's most sensitive scientific information and had access to a wide range of Colossal's proprietary programs and teams – including Colossal's Avian Genomics Group and dodo and moa de-extinction projects. In

recognition of that position of trust, Kehler promised – not once, but on three separate occasions – to protect Colossal's confidential and trade secret information.

4. Instead of honoring his contractual and statutory obligations, however, Kehler has, on information and belief, pivoted from scientist to thief. Recent forensic analysis of Kehler's Colossal laptop shows the exfiltration of confidential Colossal documents to a personal cloud account and devices. On information and belief, Kehler has been attempting to cash in on Colossal's confidential and trade secret information by using it, without authorization, to advance his projects at multiple competing ventures. Further, Kehler has, on information and belief, breached other contractual obligations to Colossal as part of a calculated strategy to unfairly compete and undermine Colossal's position as the industry leader in the biotechnology and genetic engineering space.

5. Kehler's conduct threatens irreparable harm to Colossal's competitive position, its scientific programs, its relationships, and its goodwill. Colossal brings this action to stop Kehler's ongoing misconduct, to recover damages for the harm he has caused, and to protect the trade secrets and confidential information on which its mission depends.

## PARTIES

6. Plaintiff Colossal Biosciences Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas.

7. Defendant James Kehler is an individual who, on information and belief, resides and is domiciled in the State of Maryland.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836, *et seq.* This Court has supplemental jurisdiction over Colossal's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

9. In the alternative, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. Colossal is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Dallas, Texas, and is therefore a citizen of the States of Delaware and Texas for purposes of diversity jurisdiction pursuant to 28 U.S.C. § 1332(c)(1). Colossal is informed and believes that Kehler is an individual who resides and is domiciled in the State of Maryland, and is therefore a citizen of the State of Maryland for purposes of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, exclusive of interest and costs, in that Colossal seeks, *inter alia*, damages as well as injunctive relief.

10. This Court has personal jurisdiction over Kehler. In the Employee Proprietary Information Agreement described below, Kehler expressly "CONSENT[ED] TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN TRAVIS COUNTY, TEXAS," and acknowledged that, in the performance of his duties, he would "MAINTAIN SIGNIFICANT CONTACTS WITH TRAVIS COUNTY, TEXAS." In addition, Kehler purposefully availed himself of the privilege of conducting activities in Texas by, among other things, accepting and maintaining employment with Colossal, a company headquartered in Texas, where Kehler's department was based out of Colossal's Dallas office; serving as a Principal Investigator at the University of Texas Southwestern Medical Center in Dallas, Texas, where he oversaw research for Colossal; entering into multiple agreements with Colossal governed by Texas law; and, on information and belief, misappropriating trade secrets and confidential information developed in and maintained in Texas, causing injury to Colossal in Texas. Colossal's claims arise out of and relate to those Texas contacts, and the exercise of jurisdiction over Kehler comports with traditional notions of fair play and substantial justice.

11. Venue is proper in this District and Division. In the Employee Proprietary Information Agreement, Kehler agreed that "THE EXCLUSIVE VENUE FOR RESOLVING ANY DISPUTE BETWEEN [HIM AND COLOSSAL] SHALL BE THE STATE AND

FEDERAL COURTS LOCATED IN TRAVIS COUNTY, TEXAS," acknowledged that "TRAVIS COUNTY, TEXAS, WOULD NOT BE AN INCONVENIENT FORUM OR VENUE," and waived "ANY OBJECTION TO TRAVIS COUNTY, TEXAS, AS A FORUM AND VENUE . . . INCLUDING BUT NOT LIMITED TO ANY OBJECTION BASED ON CONVENIENCE." Travis County lies within the Austin Division of the Western District of Texas. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Colossal's claims occurred in this District, including the development of the misappropriated trade secrets and Colossal confidential information.

## FACTUAL ALLEGATIONS

### A. COLOSSAL: THE DE-EXTINCTION COMPANY

12. Colossal is a pioneering biosciences and genetic engineering company dedicated to de-extinction and species preservation. Founded in 2021 by entrepreneur Ben Lamm and world-renowned geneticist George Church, Ph.D., of Harvard Medical School and MIT, Colossal's mission is to combine the science of genetics with the business of discovery.

13. Colossal's science is directed at halting and undoing the large-scale loss of biodiversity, safeguarding threatened species, and returning keystone species to the ecosystems that have suffered from their absence. Colossal aims to be the first company to bring back lost species, including the woolly mammoth and the dodo, using CRISPR gene editing and, in pursuing that goal, to develop new software and technologies that move the entire field of genomics forward.

14. To accomplish that mission, Colossal employs scientists and operates laboratories on multiple continents, each focused on a particular area of expertise and all working toward the same goal. Colossal's headquarters laboratory in Dallas, Texas, anchors work on Colossal's global projects. Its scientists process tissue samples from critically endangered animals, expand Colossal's bank of preserved cell lines and gametes, develop methods to reprogram stem cells from non-model species, and edit genomes both to restore extinct species and to strengthen the genetic diversity of imperiled populations.

15. Colossal's scientists are dedicated to engineering world-leading, novel advances across the scientific and technological disciplines that de-extinction requires. Those disciplines include Genome Engineering, Embryology, Computational Biology, Exogenous Development (artificial wombs and artificial eggs), Stem Cell Reprogramming, Cellular Engineering, and Animal Husbandry, and utilizing next-generation techniques and platforms in multiplex genome editing. Each division's work builds on the others', and together they form an integrated, end-to-end de-extinction and conservation pipeline that no other company possesses.

16. Colossal's investment in that science has produced historic results. Colossal has publicly announced the birth of gray wolves engineered with traits of the extinct dire wolf, as well as genetically engineered "woolly mice" bearing woolly mammoth traits, as proof of concept for its mammoth program. Colossal's programs to restore the other extinct species, including mammals like the thylacine and bluebuck, and birds like the dodo and moa, continue to advance.

17. Colossal's avian programs, including its dodo and giant moa projects, are central to that pipeline. Colossal's dodo project aims to improve the state of the art in multiplex genome editing, to culture Nicobar pigeon primordial germ cells ("PGCs"), and to demonstrate interspecies germline transfer of pigeon PGCs into a surrogate chicken host. Colossal's moa effort similarly uses cultured PGCs as a substrate for genetic editing, together with multiplex genome editing, large-cargo DNA delivery, and automated cell-production and editing workflows.

18. Colossal has announced concrete results from that work. In September 2025, Colossal announced long-term culture of pigeon PGCs, the precursors of sperm and eggs, after testing more than 300 combinations of growth factors and small molecules, and the development of gene-edited chickens that do not produce their own germ cells and can serve as surrogate hosts for edited avian germ cells. In May 2026, Colossal announced that it had hatched chicks from a fully artificial egg system developed by its Exogenous Development team, and stated that the platform could help develop genome-edited avian lines and that transgenic chickens are an emerging platform for producing therapeutic proteins, such as monoclonal antibodies and human cytokines, in egg white. In October 2026, Colossal announced that it had derived Nicobar pigeon

PGCs from eggs collected in a breeding season, hatched chimeras produced from cultured avian embryonic stem cells, developed a lipid-nanoparticle system for delivering DNA, RNA, and CRISPR gene-editing tools into avian embryos, and built an internal artificial-intelligence platform, GenoMorph, to identify candidate regulatory elements.

19. At the core of Colossal's avian work is not any single end product but the underlying platform science: the methods for designing genetic edits, building them, and delivering them into cells and embryos, and for deriving, culturing, and engineering avian PGCs and embryonic stem cells so that edits are carried into the germline. These methods, which include, among other things, multiplex genome editing, large-cargo DNA delivery, PGC and embryonic stem cell culture, germline transmission through chimeric and surrogate-host birds, and genotype-to-phenotype prediction, are enabling technologies that can be applied to any avian species and to many other purposes. Colossal developed them through years of experimentation at great expense.

## B. COLOSSAL'S TRADE SECRETS & CONFIDENTIAL INFORMATION

20. The lifeblood of Colossal's industry-leading science and business is its proprietary trade secret information. Although Colossal publicly announces certain milestones, the scientific and engineering methods, protocols, parameters, data, designs, and know-how that made those milestones possible are not public. These trade secrets include, among many other confidential categories: proprietary genome-editing and cell-engineering systems and platforms, methods, workflows, reagents, vector designs, and editing strategies; proprietary embryonic stem cell targeting and editing methods; proprietary methods and parameters for reprogramming somatic cells into induced pluripotent stem cells in non-model species; proprietary methods and parameters for avian PGC derivation and culture, embryonic stem cell culture, and germline transmission through chimeric and surrogate-host birds, including those developed for Colossal's dodo and moa projects; proprietary multiplex genome-editing strategies, large-cargo DNA delivery methods, and delivery systems for avian embryos; proprietary computational genotype-to-phenotype prediction methods and tools; proprietary methods and protocols for sourcing, selecting, handling, incubating, and manipulating avian eggs and embryos; and proprietary animal-science, husbandry, colony-

establishment, and colony-management protocols. These trade secrets are the product of years of research, experimentation, iteration, and failure, and the investment of hundreds of millions of dollars. They are not generally known by others in the biosciences (or any other) industry, and are not readily ascertainable through proper means.

21. Further, Colossal's research and development efforts rely on a multi-disciplinary team-based approach to scientific collaboration that encourages the sharing of information, insights, and tools between teams and projects. Colossal's collaborative innovation structure allows Colossal to leverage input from across its world-class teams of scientists and researchers. The only individuals who are given access to this crucial information are those within Colossal's scientific departments, who are subject to strict confidentiality obligations and information security measures as described below. Colossal personnel are also routinely advised and reminded of their responsibilities to safeguard proprietary Colossal information and ensure that such information is not disclosed outside of the company.

22. Colossal's trade secrets and confidential information are the core of its competitive advantage and its ability to achieve its de-extinction mission. The unauthorized use or disclosure of that information – particularly to a competitor – would allow others to replicate in days or weeks what took Colossal years to develop, and at a fraction of the cost. Such unauthorized use or disclosure would inflict severe and irreparable harm on Colossal and on the goals it exists to achieve.

23. Colossal has at all times taken comprehensive measures to protect the secrecy of its trade secret information. Colossal requires all employees, contractors, consultants, and vendors to sign confidentiality agreements before any confidential or proprietary trade secret information is disclosed to them. Colossal follows best practices for safeguarding its networks and systems. All networks hosting Colossal's confidential and trade secret information have been and continue to be encrypted and have at all times required passwords and multi-factor authentication for access. Employees undergo awareness sessions and training regarding IT policies to prevent unauthorized disclosure of Colossal's information. And Colossal secures its physical facilities by restricting

access to authorized personnel and then monitoring actual access with security cameras and guards at all times.

24. Due to these security measures, Colossal's confidential and trade secret information is not available to others in the bioscience industry – or any other industry – to use through any legitimate means.

### C. KEHLER'S ACCESS TO, AND AGREEMENTS TO PROTECT, COLOSSAL' CONFIDENTIAL INFORMATION

25. Kehler joined Colossal in September 2022 as Vice President of Animal Sciences. He was subsequently promoted to Vice President of BioSynergy. Both roles reported directly to Colossal's Chief Science Officer. As a member of Colossal's senior scientific leadership with cross-disciplinary responsibilities, Kehler executed several agreements requiring protections of Colossal's confidential and proprietary information augmenting his statutory and fiduciary confidentiality and loyalty obligations. In his roles, Kehler was granted access to Colossal's most sensitive proprietary information across a wide range of teams and programs. Beyond the cutting-edge multiplex genome editing and stem cell biology at the core of Colossal's scientific mission, Kehler also had particular insight into Colossal's proprietary animal protocols, including by serving as the Institutional Official of Colossal's Institutional Animal Care and Use Committee ("IACUC"). Among other teams, Kehler interacted with Colossal's Avian Genomics Group – including the proprietary dodo and moa de-extinction projects – and was involved in at least one Colossal avian program involving chicken eggs.

26. During his employment at Colossal, Kehler would gain access to, and be intimately involved with interactions with various scientific teams at Colossal, but specifically avian teams which, on the path for de-extinction of the dodo, worked on research and development activities related to chickens, chicken surrogates and avian PGCs and embryonic stem cell (ESC) technology for the purposes of key developmental advances. Access to this research and teams working on this research exposed him to technologies and developmental techniques critical to avian embryology, cell cultures, ESC- and PGC-related research designs, genotyping and sextyping, as

well as confidential research design strategies and workflows, that all constitute Colossal trade secrets and confidential information.

27. During his employment at Colossal, Kehler also gained access to research and development relevant to, and communicated with Colossal scientists regarding, feline and specifically hypoallergenic cat gene engineering. These too constitute Colossal trade secrets and confidential information.

28. Over the course of his tenure at Colossal (including six months as a consultant in late 2025 and early 2026), Kehler explicitly promised to protect Colossal's confidential and trade secret information in no fewer than three separate agreements.

1. Employee Proprietary Information Agreement ("EPIA")

29. Kehler's August 22, 2022 Offer of Employment with Colossal Biosciences Inc. ("Offer Letter") made Kehler's agreement to protect Colossal's confidential and proprietary information a prerequisite to his employment. It provided expressly: "As a condition of this offer of employment, you will be required to complete, sign and return the Company's standard form of Employee Proprietary Information Agreement (the 'EPIA')." Kehler accepted the Offer Letter on August 24, 2022. That same day, Kehler signed the EPIA.

30. The EPIA opens by confirming that Kehler entered into it "[a]s a condition of my employment with Colossal Biosciences, Inc." and "in consideration of my receipt of confidential information and my receipt of the compensation now and hereafter paid to me by Company." In the EPIA, Colossal agreed "to provide [Kehler] with certain Confidential Information regarding the Company that will enable [him] to optimize the performance of [his] duties to the Company," and Colossal did so throughout Kehler's employment. EPIA § 2(d).

31. The EPIA broadly defines the scope of Colossal's "Confidential Information" that Kehler agreed to protect:

> I understand that "Confidential Information" means any information that relates to the Company's actual or anticipated business or research and development, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other

> information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, the Company's customers on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information.

EPIA § 2(a).

32. Kehler's confidentiality obligations under the EPIA are ongoing. In the EPIA, Kehler agreed:

> I agree at all times during the term of my employment *and thereafter* to hold in strictest confidence, and not to use, except for the benefit of the Company, any of the Company's Confidential Information; or disclose to any person, firm or corporation any of the Company's Confidential Information except as authorized by the Company's management in connection with my authorized duties on behalf of the Company, and then only pursuant to a written non-disclosure agreement that sufficiently protects the Confidential Information.

EPIA § 2(a) (emphasis added).

33. The EPIA further required Kehler to return all of Colossal's property and information when he left:

> I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence (including emails), specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns . . . .

EPIA § 8.

34. Kehler also agreed in the EPIA that money damages would not be an adequate remedy for any breach of the EPIA's confidentiality provision (among others that survive termination, such as the non-solicitation obligation). He agreed "that it would be impossible or inadequate to measure and calculate the Company's damages from [his] breach of Sections 2, 3, 4, 5, 6 and 7," that Colossal would have "the right to obtain an injunction from a court of competent

jurisdiction restraining such breach or threatened breach and to specific performance," and "that no bond or other security shall be required in obtaining such equitable relief." EPIA § 11(b).

2. Separation Agreement

35. In 2025, Kehler resigned his employment with Colossal to move into a consulting role, in connection with which Kehler and Colossal entered into a Separation and Release Agreement (the "Separation Agreement"). Kehler signed the Separation Agreement on September 18, 2025, beneath the words "READ, UNDERSTOOD AND AGREED."

36. In the Separation Agreement, Kehler again promised to return all of Colossal's property and data:

> Return of Company Property: You warrant to the Company that, no later than three (3) business days after your Separation Date, you will return to the Company all property or data of the Company of any type that has been in your possession or control, including, but not limited to keys, access codes or devices, electronically stored documents or files, physical files, marketing documents, computer equipment, cell phone, PDA and passwords. All electronic items will be returned in the same working condition in which they were issued.

Separation Agreement § 6.

37. The Separation Agreement also required Kehler to acknowledge expressly that he remained bound by the EPIA, a copy of which was attached as Exhibit A to the Separation Agreement:

> Proprietary Information: You acknowledge that you are bound by the Company's Employee Proprietary Information Agreement (the "EPIA"), a copy of which is attached as Exhibit A, which you signed while employed by the Company (the "Confidentiality Agreement").

Separation Agreement § 7.

38. In addition, Kehler agreed that he would not make any defamatory statements about Colossal, its people, or its business:

> No Disparagement: Subject to the Protected Rights paragraph above, you agree that you will never make any defamatory statements publicly or privately, online or offline, orally or in writing about the Company or its stockholders, directors, officers,

> employees, products, services or business practices, your employment with the Company, or the termination of that employment.

Separation Agreement § 11.

3. <u>Consulting Agreement</u>

39. On October 6, 2025, Colossal and Kehler entered into a Consulting Agreement (the "Consulting Agreement"), with an initial term of six months. Like the EPIA, the Consulting Agreement contains robust confidentiality protections. It broadly defines "Confidential Information" as follows:

> Definition. "Confidential Information" means any proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to or accessed by one Party either directly or indirectly in writing, orally or by drawings or inspection of parts or equipment.

Consulting Agreement § 2(a).

40. Pursuant to the Consulting Agreement, Kehler again agreed, both during and after its term, not to disclose or use Colossal's confidential information for any purpose other than performing services for Colossal:

> Non-Use and Non-Disclosure. Consultant will not, during or subsequent to the term of this Agreement, use the Company's Confidential Information for any purpose whatsoever other than the performance of the Services on behalf of the Company or disclose the Company's Confidential Information to any third party. It is understood that all Confidential Information shall remain the sole property of the Company unless otherwise agreed to by the Parties. Consultant further agrees to take all reasonable precautions to prevent any unauthorized disclosure of such Confidential Information. . . .

Consulting Agreement § 2(b).

41. Pursuant to the Consulting Agreement, Kehler agreed that Colossal "shall own all right, title and interest in and to all Confidential Information." Consulting Agreement § 3(d).

42. The Consulting Agreement also expressly provides for the return of Colossal's property and confidential information. Section 2(e) provides: "Upon the termination of this Agreement, or upon Company's earlier request, Consultant will deliver to the Company all of the Company's property or Confidential Information that Consultant may have in Consultant's possession or control." Consulting Agreement § 2(e). Section 6(d) separately requires that, "[u]pon the expiration or termination of this Agreement for any reason, . . . Consultant shall turn over to the Company all (i) work product, whether or not completed and (ii) property and materials furnished to Consultant by the Company or paid for by the Company in support of the work under this Agreement." Consulting Agreement § 6(d).

43. Kehler further agreed to non-competition and non-solicitation covenants in the Consulting Agreement. "In consideration of the Company's retention of Consultant under this Agreement, disclosure to Consultant of the Confidential Information, and other valuable consideration and in view of Consultant's access to the Company's trade secrets and proprietary know-how," Kehler agreed that, during the term of the Consulting Agreement and for twelve months following its expiration or termination, he would not, in any location where Colossal conducts research and development or markets its products: (i) engage in or carry on a business similar to or in competition with Colossal's business as conducted or planned during the term of the agreement; (ii) directly or indirectly own, operate, control, be employed by, or assist any business similar to or in competition with that business; (iii) provide services for any other party that involve or relate to developing, marketing, or supporting any product or service that competes, or may in the future compete, with that business; (iv) solicit business from certain Colossal customers; or (v) directly or indirectly solicit, induce, recruit, or encourage any of Colossal's employees to leave their employment, or hire or take away such employees. Consulting Agreement § 5(a). Kehler acknowledged that these obligations are ancillary to his nondisclosure obligations. *Id.* § 5(c).

44. Kehler's obligations under Sections 2, 3, 5(a), 6(d), and 6(e) of the Consulting Agreement expressly survive its expiration or termination. Consulting Agreement § 6(e).

### D. KEHLER MISAPPROPRIATES COLOSSAL TRADE SECRETS AND CONFIDENTIAL INFORMATION TO BENEFIT COMPETITORS

45. Following his departure from Colossal, Kehler has joined multiple biotechnology start-ups. On information and belief, he has brought stolen Colossal trade secrets with him to each of them. Forensic analysis of Kehler's Colossal laptop shows that prior to leaving he exfiltrated files containing Colossal confidential and trade secret information to a personal cloud account and multiple personal devices.

46. On or about April 14, 2026, Kehler formally joined Neion Bio, Inc. ("Neion Bio") as Head of Avian Sciences.

47. Neion Bio is a biotechnology company that describes its mission as using chicken eggs to "build living bioreactors to manufacture any biomolecule at scale – powered by next-generation genetic engineering and stem cell biology." *See* https://www.neionbio.com/#technology (accessed on Nov. 6, 2026). According to Neion Bio's public statements, its technical process includes culturing PGCs and ESCs from early chick embryos, multiplex genome editing to insert a transgene into the chicken ovalbumin gene, and injecting the edited cells into embryos so that the edit is carried through the germline. *See* https://www.genengnews.com/topics/bioprocessing/from-colossal-to-chickens-the-scientists-behind-neion-bios-biologics-platform/ (accessed Nov. 6, 2026).

48. In an interview discussing his arrival at Neion Bio, Kehler stated that he was "taking everything I know about stem cell biology, germ cell biology, and gene editing, and bringing that to bear to make what should be a disruptive, transformational approach to making drugs." *See* https://www.genengnews.com/topics/bioprocessing/from-colossal-to-chickens-the-scientists-behind-neion-bios-biologics-platform/ (accessed Nov. 6, 2026). On information and belief, that includes Colossal's proprietary trade secret and confidential information.

49. Although Colossal applies its platform technologies to de-extinction and conservation and, on information and belief, Neion Bio applies similar technologies to biologics manufacturing, the know-how that makes both applications possible is the same: how to design

genetic edits, deliver them into cells and embryos (including avian embryos) and obtain edited animals (including birds). On information and belief, there is substantial cross-over between the avian work Neion Bio has hired Kehler to lead and the avian work Kehler supported and learned at Colossal, including specifically Colossal's dodo de-extinction and moa projects, and Kehler has used and disclosed Colossal trade secret and confidential information to Neion Bio. Without limitation, what Kehler brought to Neion Bio includes, on information and belief, the platform know-how he acquired at Colossal, including its methods for genome editing, including multiplex genome editing, for deriving and culturing PGCs and ESCs, and for obtaining germline transmission of edits in birds. All of this is in violation of his contractual and statutory obligations.

50. Kehler has also been publicly connected to Felix Pets, LLC ("Felix Pets"), a start-up that states it is developing gene-edited hypoallergenic cats. According to Felix Pets' public statements, its technical process includes removing the allergen gene from a single cat cell using programmable genome-editing tools, using the edited cell's nucleus to create an embryo, implanting that embryo in a surrogate, and then breeding the resulting animals so that the edit is carried through the germline. *See* https://www.felixpets.com/ (accessed on Nov. 6, 2026)*;* https://www.felixpets.com/the-science (accessed on Nov. 6, 2026).

51. On information and belief, that process depends on the same research and know-how underlying Colossal's de-extinction work: how to derive and culture cell lines, design genetic edits, deliver them into cells and embryos, and obtain genetically modified animals. Moreover, it is related to work that Kehler communicated about with other Colossal scientists.

52. Felix Pets represents that it has made "terrific progress" in the last eight months and expects to have a small number of gene-edited, allergen-free kittens available for sale by the fall of 2027. *See* https://www.felixpets.com/925764824480 (accessed on Nov. 6, 2026). On information and belief, that progress coincides with Kehler's departure from Colossal and arrival at Felix Pets.

53. Further, on information and belief, Kehler's ongoing breaches and anticompetitive conduct against Colossal are not limited to his use and disclosure of Colossal trade secrets to

multiple competing companies, but also includes disparagement of Colossal to multiple individuals within the biotechnology industry.

### E. COLOSSAL IS SUFFERING IRREPARABLE HARM

54. Kehler's unlawful conduct has caused and, unless enjoined, will continue to cause Colossal substantial and irreparable harm, including the loss of the secrecy and value of its trade secrets and confidential information, the erosion of its competitive advantage and lead time, harm to its scientific programs, relationships, and goodwill, and the loss of value in its business. Once disclosed, Colossal's trade secrets and confidential information cannot be made secret again. As Kehler himself agreed, it would be impossible or inadequate to measure and calculate Colossal's damages from his breaches. EPIA § 11(b).

## FIRST CAUSE OF ACTION
## (Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836)

55. Colossal repeats and realleges the allegations contained in paragraphs 1 through 54 as if fully set forth herein.

56. The DTSA allows "[a]n owner of a trade secret that is misappropriated" to "bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

57. Colossal owns, possesses, and controls trade secrets, as defined by the DTSA, 18 U.S.C. § 1839(3).

58. Colossal's trade secrets consist of scientific, technical, engineering, and business information, including methods, techniques, processes, procedures, protocols, designs, data, and compilations, developed by Colossal at great expense over a period of years.

59. Colossal has taken reasonable measures to maintain the secrecy of its trade secrets, including as set forth above.

60. Colossal's trade secrets are not generally known and derive independent economic value from their secrecy, including as set forth above. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage to Colossal.

61. Colossal's trade secrets are not readily ascertainable through proper means, including as set forth above.

62. Colossal's trade secrets are related to products and services used in, or intended for use in, interstate and foreign commerce.

63. Kehler has misappropriated Colossal's trade secrets, as defined by the DTSA, by acquiring, using, or disclosing Colossal's trade secrets without Colossal's consent and by improper means, such as breach of contract.

64. In addition, Kehler has retained Colossal's documents, data, and materials containing the trade secrets after his authorization to possess them ended, and has acquired or retained the trade secrets through "improper means" within the meaning of 18 U.S.C. § 1839(6), including through "breach . . . of a duty to maintain secrecy."

65. Kehler's misappropriation was willful and malicious. Kehler knew that the trade secrets belonged to Colossal, repeatedly acknowledged his obligations to protect them, and nevertheless used and disclosed them for his own benefit and that of Colossal's competitors.

66. As a direct and proximate result of Kehler's misappropriation, Colossal has suffered and continues to suffer substantial harm, including the loss of the value and secrecy of the trade secrets, loss of competitive advantage, and harm to its reputation and goodwill. Colossal is entitled to recover its actual loss and damages for the unjust enrichment Kehler has obtained that is not addressed in computing actual loss, or, in the alternative, a reasonable royalty. 18 U.S.C. § 1836(b)(3)(B).

67. Because Kehler's misappropriation was willful and malicious, Colossal is entitled to exemplary damages in an amount up to two times its damages, 18 U.S.C. § 1836(b)(3)(C), and to its reasonable attorneys' fees, 18 U.S.C. § 1836(b)(3)(D).

68. Colossal is also entitled to injunctive relief, consistent with 18 U.S.C. § 1836(b)(3)(A), "to prevent [Kehler's] actual and threatened misappropriation" of the trade secrets, including an order prohibiting Kehler from using or disclosing the trade secrets and

requiring Kehler to return all documents, data, and materials containing or reflecting the trade secrets.

**SECOND CAUSE OF ACTION**
**(Violation of Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001, *et seq.*)**

69. Colossal repeats and realleges the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

70. The Texas Uniform Trade Secrets Act ("TUTSA") allows the owner of a trade secret to obtain injunctive relief and to recover damages for the misappropriation of that trade secret. Tex. Civ. Prac. & Rem. Code §§ 134A.003, 134A.004.

71. Colossal owns trade secrets, as defined by Tex. Civ. Prac. & Rem. Code § 134A.002(6).

72. Colossal's trade secrets consist of scientific, technical, engineering, and business information, including methods, techniques, processes, procedures, protocols, designs, data, and compilations, developed by Colossal at great expense over a period of years.

73. Colossal has taken reasonable measures under the circumstances to maintain the secrecy of its trade secrets, including as set forth above.

74. Colossal's trade secrets are not generally known and derive independent economic value from their secrecy, including as set forth above.

75. Colossal's trade secrets are not readily ascertainable through proper means, including as set forth above.

76. Kehler has misappropriated Colossal's trade secrets, as defined by the TUTSA, by using or disclosing Colossal's trade secrets without Colossal's consent and by improper means, such as breach of contract.

77. In addition, Kehler has acquired or retained the trade secrets through "improper means" within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.002(2), including through "breach . . . of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret."

78. Kehler's misappropriation was willful and malicious within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.002(7), in that it was intentional and committed with conscious disregard of Colossal's rights.

79. As a direct and proximate result of Kehler's misappropriation, Colossal has suffered and continues to suffer substantial harm, including the loss of the value and secrecy of its trade secrets, loss of competitive advantage, and harm to its reputation and goodwill. Colossal is entitled to recover its actual loss and damages for the unjust enrichment Kehler has obtained that is not taken into account in computing actual loss, or, in the alternative, a reasonable royalty. Tex. Civ. Prac. & Rem. Code § 134A.004(a).

80. Because Kehler's misappropriation was willful and malicious, Colossal is entitled to exemplary damages in an amount up to twice its damages award, Tex. Civ. Prac. & Rem. Code § 134A.004(b), and to its reasonable attorneys' fees, Tex. Civ. Prac. & Rem. Code § 134A.005.

81. Colossal is also entitled to injunctive relief to prevent Kehler's actual and threatened misappropriation of the trade secrets, including an order prohibiting Kehler from using or disclosing the trade secrets and requiring Kehler to return all documents, data, and materials containing or reflecting the trade secrets. Tex. Civ. Prac. & Rem. Code § 134A.003.

## THIRD CAUSE OF ACTION
**(Breach of Contract, Employee Proprietary Information Agreement)**

82. Colossal repeats and realleges the allegations contained in paragraphs 1 through 81 as if fully set forth herein.

83. The EPIA is a valid, binding, and enforceable contract between Colossal and Kehler, supported by valuable consideration, including Kehler's employment, compensation, and equity, and Colossal's provision to Kehler of its confidential information and trade secrets.

84. Colossal fully performed its obligations under the EPIA, including by employing and compensating Kehler and by providing him with its confidential information and trade secrets.

85. Kehler breached the EPIA by, among other things:

(a) on information and belief, failing to hold Colossal's confidential information in strictest confidence, using it for purposes other than the benefit of Colossal, and disclosing it without authorization to others, including Colossal's competitors, in violation of Section 2(a);

(b) on information and belief, failing to deliver to Colossal, and keeping in his possession, Colossal's devices, records, data, documents, materials, and other property and reproductions thereof, in violation of Section 8.

86. As a direct and proximate result of Kehler's breaches, Colossal has suffered and will continue to suffer damages, including the loss of the value of its confidential information and competitive advantage, the loss of employees, and harm to its goodwill, in an amount to be proven at trial.

87. Kehler agreed that it would be impossible or inadequate to measure and calculate Colossal's damages from his breach of Section 2 of the EPIA, and that Colossal is entitled to an injunction restraining such breach or threatened breach and to specific performance, without bond. EPIA § 11(b). Colossal is entitled to injunctive relief and specific performance of the EPIA.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract, Separation and Release Agreement)**

88. Colossal repeats and realleges the allegations contained in paragraphs 1 through 87 as if fully set forth herein.

89. The Separation Agreement is a valid, binding, and enforceable contract between Colossal and Kehler, supported by valuable consideration.

90. Colossal fully performed its obligations under the Separation Agreement.

91. Kehler breached the Separation Agreement by, among other things:

(a) on information and belief, failing to return to Colossal, within three business days after the separation date, all property and data of Colossal in his possession or control, including electronically stored documents and files, in breach of his warranty in Section 6;

(b) on information and belief, violating the EPIA, by which he acknowledged in Section 7 that he remained bound, including by using and disclosing Colossal's confidential information without authorization; and

(c) on information and belief, making false and defamatory statements about Colossal and its officers, employees, products, services, and business practices to others in the same industry and to current and former employees of Colossal, in violation of Section 11.

92. As a direct and proximate result of Kehler's breaches, Colossal has suffered and will continue to suffer damages, including harm to its reputation, goodwill, and relationships with its employees and others in the industry, and the loss of the value of its confidential information, in an amount to be proven at trial.

**<u>FIFTH CAUSE OF ACTION</u>**
**(Breach of Contract, Consulting Agreement)**

93. Colossal repeats and realleges the allegations contained in paragraphs 1 through 92 as if fully set forth herein.

94. The Consulting Agreement is a valid, binding, and enforceable contract between Colossal and Kehler, supported by valuable consideration, including Colossal's retention of and payment to Kehler and its disclosure to him of its confidential information and trade secrets.

95. Colossal fully performed its obligations under the Consulting Agreement, including by paying Kehler the compensation owed to him.

96. Kehler's obligations under Sections 2, 3, 5(a), 6(d), and 6(e) of the Consulting Agreement survived its expiration or termination. Consulting Agreement § 6(e).

97. Kehler breached the Consulting Agreement by, among other things:

(a) on information and belief, using Colossal's confidential information for purposes other than the performance of services on Colossal's behalf, disclosing it to third parties, and failing to take reasonable precautions to prevent its unauthorized disclosure, in violation of Section 2(b);

(b) on information and belief, treating Colossal's confidential information as his own, in derogation of Colossal's ownership of all right, title, and interest in that information, in violation of Section 3(d); and

(c) on information and belief, failing to deliver to Colossal all of Colossal's property, confidential information, work product, and materials in his possession or control upon expiration or termination of the Consulting Agreement, in violation of Sections 2(e) and 6(d).

98. As a direct and proximate result of Kehler's breaches, Colossal has suffered and will continue to suffer damages, including the loss of the value of its confidential information and competitive advantage, the loss of employees, and harm to its goodwill, in an amount to be proven at trial.

99. Colossal is entitled to recover its reasonable attorneys' fees pursuant to Sections 10 and 12 of the Consulting Agreement and Tex. Civ. Prac. & Rem. Code § 38.001(b)(8).

## JURY DEMAND

100. Pursuant to Federal Rule of Civil Procedure 38(b), Colossal hereby demands trial by jury on all issues properly triable thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Colossal respectfully requests that this Court grant it the following relief:

a. Judgment in Colossal's favor and against Kehler on all causes of action alleged herein;

b. Actual damages in an amount to be proven at trial, together with pre-judgment and post-judgment interest thereon at the highest rate allowed by law;

c. Exemplary damages in an amount up to two times Colossal's damages for Kehler's willful and malicious misappropriation, pursuant to 18 U.S.C. § 1836(b)(3)(C) and Tex. Civ. Prac. & Rem. Code § 134A.004(b);

d. Equitable relief, including temporary, preliminary, and permanent injunctive relief (i) prohibiting Kehler from using or disclosing Colossal's trade secrets and confidential information; (ii) requiring Kehler to return to Colossal all documents, data, materials, and property containing or reflecting Colossal's trade secrets and confidential information, and to certify his compliance; and (iii) prohibiting Kehler from making false and defamatory statements in violation of the Separation Agreement;

e. Attorneys' fees and costs as allowed by law, including pursuant to 18 U.S.C. § 1836(b)(3)(D), Tex. Civ. Prac. & Rem. Code §§ 38.001(b)(8) and 134A.005, and Sections 10 and 12 of the Consulting Agreement; and

f. All other relief, legal or equitable, which the Court deems just and proper.

DATED: November 6, 2026

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

/s/ *Asher B. Griffin*
Asher B. Griffin
TX State Bar No. 24036684
300 West 6th Street, Suite 2010
Austin, Texas 78701
Telephone: (737) 667-6100
Fax: (737) 667-6110
ashergriffin@quinnemanuel.com

Alex Spiro
*Pro Hac Vice Application forthcoming*
alexspiro@quinnemanuel.com
Rajat Rana
*Pro Hac Vice Application forthcoming*
rajatrana@quinnemanuel.com
295 5th Avenue
New York, New York 10016-7103
Telephone: (212) 849-7000
Fax: (212) 849-7100

James D. Judah
*Pro Hac Vice Application forthcoming*
50 California Street, 22nd Floor
San Francisco, California 94111
jamesjudah@quinnemanuel.com
Telephone: (415) 875-6600
Fax: (415) 875-6700

*Attorneys for Plaintiff Colossal Biosciences Inc.*